27

RECEIPT NUMBER
510551

# ORIGINAL

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel,
SANDRA FILLION,

**04-72635**

Plaintiff-Relator,

NO: 04-   **JOHN FEIKENS**

vs.

HON:

TRINITY HEALTH – MICHIGAN,
a non-profit corporation,
ST. JOSEPH MERCY OAKLAND HOSPITAL,
A non-profit corporation, TRINITY CONTINUING
CARE SERVICES, a non-profit corporation,
MICHIGAN PHYSICIAN SERVICES, a Michigan corporation,
RAJENDRA DESAI, M.D., DR. DAVID COWAN, M.D.,
REKHA KHERA, M.D., ANAN ABDELRAHMAN, M.D.,
GEORGE KAZZI, M.D., DR. DANIEL J. SAK, D.O.,
LEONARD J. ROSENTHAL, M.D., DR. ALBERT BRADY, M.D.,
JANE JOHNSON, M.D., TIMOTHY DICKSON, M.D., VIOLETA GRIVEJ, M.D.,
Jointly and Severally,

**FILED IN CAMERA AND UNDER SEAL**

MAGISTRATE JUDGE MONA K. MAJZOUB

Defendants.

/

**SOMMERS, SCHWARTZ,**
**SILVER & SCHWARTZ, P.C.**
**By:   PATRICIA A. STAMLER   (P35905)**
      **DANIEL D. SWANSON (P29288)**
Attorneys for Plaintiff-Relator
2000 Town Center
Suite 900
Southfield, MI 48075-1100
(248) 355-0300; FAX (248) 746-4001

# FILED

JUL 1 6 2004

CLERK'S OFFICE, DETROIT-PSG
U.S. DISTRICT COURT

/

There is no other pending or resolved civil action out of the transaction or
occurrence alleged in the Complaint.

**COMPLAINT FOR VIOLATION OF FALSE CLAIMS ACT (QUI TAM)**
**AND DEMAND FOR JURY TRIAL**

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

PLAINTIFF-RELATOR, Sandra Fillion, on behalf of the United States of America, by and through her attorneys, SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C., hereby files this Complaint under the False Claims Act, 21 U.S.C. §3729 et seq., and states as follows:

## PARTIES

1.      Plaintiff-Relator, Sandra Fillion(hereinafter "Relator") is a citizen and resident of the State of Michigan, United States of America and brings this action on behalf of the United States of America.

2.      Defendant Trinity Health (hereafter Trinity) is a non-profit corporation, and for all times relevant to this Complaint is doing business in Oakland County, State of Michigan and has its corporate office located in Novi, Michigan.

3.      Defendant St. Joseph Mercy Oakland Hospital (hereafter St. Joseph), is a non-profit corporation, and for all times relevant to this Complaint is doing business in Oakland County, State of Michigan and is located in Pontiac Michigan.

4.      Defendant Trinity Continuing Care Services (hereafter Trinity CCS), is a non-profit corporation, and for all times relevant to this Complaint is doing business in the City of Novi, Oakland County, State of Michigan. Defendant Trinity CCS oversees nursing homes, assisted living and seniors' housing units.

5.      Defendant Michigan Physician Services, is a Michigan Corporation and for all times relevant to this Complaint is on information and belief, a wholly owned subsidiary of St. Joseph's and has its resident agent in Novi, Michigan.

6.      Defendant Rajendra Desai, M.D. (hereafter Desai) is for all times relevant to this Complaint an employee of Defendant St. Joseph, and on information and belief is a resident of Oakland County, Michigan.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

2

7.      Defendant David Cowan, M.D. (hereafter Cowan) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

8.      Defendant Reka Khera, M.D. (hereafter Khera) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

9.      Defendant Anan Abdelrahman, M.D. (hereafter Abdelrahman) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

10.     Defendant George Kazzi, M.D. (hereafter Kazzi) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

11.     Defendant Daniel Sak, M.D. (hereafter Sak) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

12.     Defendant Leonard J. Rosenthal, M.D. (hereafter Rosenthal) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

13.     Defendant Albert Brady, M.D. (hereafter Brady) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

14.     Defendant Jane Johnson, M.D. (hereafter Johnson) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

15.     Defendant Timothy Dickson, M.D. (hereafter Dickson) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

16.     Defendant Violetta Grivej, M.D. (hereafter Grivej) is for all times relevant to this Complaint an employee of Defendant St. Joseph and on information and belief is a resident of Oakland County, Michigan.

## JURISDICTION AND VENUE

17.     This is an action to recover damages and civil penalties, on behalf of the United States of America, arising under the False Claims Act, 31 U.S.C. §3729, et seq., which provides, *inter alia*, that the United States District Court shall have exclusive jurisdiction of actions brought under this Act.

18.     Pursuant to 31 U.S.C. §3732(a), "Any action under 3730 may be brought in any judicial district in which the Defendant, or in the case of multiple Defendants, any one Defendant can be found, resides, transacts business or in which any Act proscribed by §3729 occurred."

19.     The Acts complained of herein occurred in Pontiac, Michigan, Rochester Hills, Michigan and other sites within Michigan, located within this judicial district.

20.     Pursuant to 31 U.S.C. §3729 et seq., this Complaint is to be filed in camera and under seal, and it is to remain under seal for a period of at least 60 days, and shall not be served on Defendants until the Court so orders.  Further, the Government may elect to intervene and proceed with this action within the 60 day time frame after receives both the Complaint and the material evidence submitted to it.

21.     Jurisdiction is proper based upon 28 U.S.C. §1345 and 31 U.S.C. §3732(a).

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

4

22.    Venue is proper in this district pursuant to 28 U.S.C. §1391 and 31 U.S.C. §3732(a).

## GENERAL ALLEGATIONS

23.    Plaintiff-Relator commenced her employment with Defendant St. Joseph in September 1997, as the Officer Manager for two physicians, Dr. Florek and Dr. Bruce Miller, located at 280 N. Woodward, Suite 208, Birmingham Michigan.

24.    On or about November 2000, the structure of St. Joseph Mercy changed and Officer Managers became known as Practice Operations Managers (POMs).

25.    On or about November 2000, Plaintiff-Relator's became a POM and her responsibilities expanded to include in addition to Drs. Florek and Miller, office management work for Dr. Kriendler and Dr. Yegessian located in a different office in Birmingham.

26.    Plaintiff- Relator's responsibilities for Drs. Kriendler and Yegessian were short-lived as this practice was in the process of being closed.

27.    In addition, on or about November 2000, Plaintiff-Relator was assigned to perform office management duties for two physicians who were assigned to provide services at various nursing homes. She also was responsible for office management for Drs. Larson, McCarthy, Dickson and Stachecki.  At some point in time, her job duties increased, and Dr. Bober from Pontiac, Michigan was added to her responsibilities.

28.    On or about February 2001, Robert Nowlan was hired at St. Joseph Mercy Oakland as its Network Executive.  Shortly after he arrived, he assigned Plaintiff-Relator budget work for Trinity Health's nursing homes, St. Joseph's Lake Orion site, and Drs. Florek and Miller.

29.    Sometime in 2001, Plaintiff-Relator's assignment related to the nursing homes was given to another POM.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

5

30.     In March 2002, Plaintiff-Relator became the Director of Physician Billing and also retained her title as a POM.  At the same time that she took over the Billing Department, she gave up her responsibilities for the Lake Orion site but continued to be responsible for Drs. Bober, Florek and Miller office management.  In addition, Dr. Lockwitz was added to her office management responsibilities.

31.     Shortly after Plaintiff-Relator became the Director of Physician Billing, she became cognizant that there were problems with her predecessor's job performance.

32.     Plaintiff-Relator's initial responsibilities as the Director of Physician Billing pertained to processing the claims portion of billing (accounts receivable).

33.     At that juncture, Accounts Receivable had outstanding accounts in the amount of approximately $9,000,000.00.

34.     In addition to the physician billing work, Plaintiff-Relator became the HIPAA Coordinator for the Physician Network, and provided support to the Medical Advisory Committee which had under its auspices three separate committees:  Managed Care, Operations and Compensation and Quality.

35.     Plaintiff-Relator participated in all three committees but served as the support person for the Operations Committee.

36.     Plaintiff-Relator was asked to join the Local Integrity Committee which handled issues pertaining to compliance and policies and procedures, including hospital forms.

37.     Plaintiff-Relator was also responsible for reporting information to the Medical Records Committee which included medical chart forms and auditing of the hospital pertaining to the JCAHO.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## A. DR. DESAI

38. In approximately April 2002, Mr. Robert Nowlan of Defendant St. Joseph asked Plaintiff-Relator to attend a meeting with Defendant Desai, a neonatologist, and a St. Joseph coder, Cora Roberts.

39. Upon information and belief, Defendant Desai, when completing his medical charts, would select what he thought were the correct billing codes and then completed a form entitled "Superbill" also known as a "charge ticket."

40. These superbills/charge tickets were then given to a person in data entry to enter the charges into the billing system.

41. Thereafter, batches of these "superbills" or "charge tickets" would be filed in the coders' office located in the basement of Defendant St. Joseph.

42. In April 2002, Ms. Roberts was comparing the charts and the superbills to determine if the codes Defendant Desai selected were correct or incorrect.

43. When Ms. Roberts determined that the code was in error, she would change the doctor's coding and use the correct code.

44. Defendant Desai had been illegally charging work performed by nurse practitioners as physician services.

45. Further, Defendant Desai was utilizing his nurse practitioners' notes and services as the basis for his physician charges.

46. Defendant Desai was informed that he was not allowed to charge nurse practitioner services as physician services.

47. Defendant Desai became angry and advised that he no longer wanted the coders to check his codes and change them.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

48.     Defendant Desai was told that he would be responsible for the accuracy of his coding if he refused to have the coders do this.

49.     Defendant Desai agreed to be responsible for the accuracy of his coding for services.

50.     Shortly thereafter, Plaintiff-Relator and Mr. Nowlan met with Kate Austin, an administrator at Defendant St. Joseph who held responsibility over Defendant Desai, and informed Ms. Austin of the problems with Defendant Desai.

51.     Ms. Austin acknowledged her understanding of the problem and expressed her belief that Defendant Desai would not review the charge list at the end of each day.

52.     Defendant Desai's conduct constituted intentional fraudulent billing of the federal government by charging for services that he did not render.

53.     On or about April 2002, Cora Roberts left St. Joseph Mercy Hospital, and, upon information and belief, Defendant St. Joseph did not assign a new coder to double-check Defendant Desai's entries for improper coding.

54.     On or about April 2003, the Compliance Coordinator for St. Joseph, Michelle Solomon, received an anonymous tip regarding Defendant Desai's ongoing improper billing practices.

55.     On or about February 25, 2004, Plaintiff-Relator learned from Ms. Solomon that improper billing issues continued regarding Defendant Desai.

56.     On or about February 25, 2004, Ms. Fillion and Ms. Solomon each met with Defendant Desai to discuss, in part, his 80% non-compliance rate, missing information from his records, his failure to sequence diagnostic codes for the primary diagnoses and many of his records were missing baby names and diagnosis codes.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

8

57.     Following the meeting pertaining to Defendant Desai, Plaintiff-Relator informed Defendant St. Joseph's Compliance Officer, Steve Bender, about the conversation with Defendant Desai and his refusal to sequence diagnoses or to fill in diagnosis codes.

58.     Mr. Bender told Plaintiff-Relator he would discuss these concerns with Ms. Solomon and investigate the magnitude of the issue.

## B.     DR. DAVID COWAN

59.     On or about at least 2001 to on or about 2002, Defendant Cowan, a neuropsychologist, was rendering services to Defendant St. Joseph Mercy Hospital.

60.     Defendant Cowan wrongly took his billings back to his office for and billed for direct payment to himself rather than properly bill his services through Defendant St. Joseph.

61.     Defendant St. Joseph Hospital received notice from Medicare that it had already paid Dr. Cowan for the bills that the hospital had billed on behalf of Dr. Cowan.

62.     When this problem became known, upon information and belief, the hospital severed its relationship with Defendant Cowan.

## C.     DR. REKHA KHERA

63.     Defendant Khera, Internal Medicine, was employed at Defendant St. Joseph's Medicine Center to perform rounds there and she had the role of teaching residents who were assigned there at various points in time.

64.     Defendant Khera, for several years, upon information and belief, fraudulently used residents' notes as the sole supporting documentation for billing out her services.

65.     Further, on information and belief, Dr. Khera received private payment for what should have been paid to the hospital.

66.     Many of Defendant Khera's patients were on Medicare or Medicaid.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

9

67.     Defendant St. Joseph's Medicine Center has a surgery clinic housed there.

68.     The Medicine Center's surgery clinic is and has been staffed by teaching physicians.

69.     The teaching physicians assigned to teach the surgery clinic residents are required to bill for their services using the appropriate modifier signifying that the facility is a teaching facility.

70.     Upon information and belief, the teaching physicians failed to properly code the facility as a teaching facility.

71.     The failure to use the proper modifier resulted in fraudulent billing of the federal government because physicians avoided compliance with the federal requirements known as PATH, for teaching facilities.

## D.     WOMEN'S CENTER

72.     On or about February 2003, Plaintiff-Relator received Defendant Trinity Health's final report of an audit, performed on the St. Joseph's Women's Center and Medicine Center located at 44405 Woodward, Pontiac, Michigan.

73.     Prior to receipt of the final report, Plaintiff-Relator had detected discrepancies in the billing from the Women's Center's teaching physician program, including that teaching physicians billed for their time when they were not present at the Women's Center, mandatory chart documentation was not done, and the Women's Center's on-call schedule showed that doctors who were allegedly working at the Women's Center were actually working at other locations.

74.     The audit of the Women's Center & Medicine which began in September 2002, resulted in a cessation of the submission of claims pertaining to services rendered at the Women's Center.

75.     The final audit report detailed problems with the Women's Center and confirmed that physicians who were supposed to teach residents were not present but did bill for their services.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

76. The final audit report confirmed upcoding was occurring; that is low complexity services were charged at higher codes.

77. The final audit report revealed improper coding was occurring.

78. On or about October 17, 2003, the Women's Center's doctors had a theoretical schedule in place, to wit: Defendant Abdelrahman was supposed to be there Monday and Friday; Dr. Vlachos was scheduled to be there Wednesdays and Thursdays and Defendant. Kazzi was scheduled to be there Tuesdays.

79. The final audit report stated that Defendant Abdelrahman would arrive at 9:00 a.m. and would leave by 11:00 a.m.

80. The Women's Center facility used approximately 7 to 10 contractual physicians known as "moonlighters", who worked there sporadically.

81. The final audit report stated that staff was unable to state that 100% of the time there was a physician present and they could not specify who was present when.

82. Residents at the Women's Center charted their work and the teaching physician, who was not present for the residents' consult, would sign off on the chart.

83. Defendant Kazzi ran the high-risk pregnancy portion of Women's Center.

84. According to the final audit report, substitute physicians came from a moonlighting pool.

85. However, the moonlighting contract was for coverage for in-patient hospital services' teaching programs, not to provide coverage for the Women's Center.

86. Patients at the Women's Center were and are largely Medicaid recipients.

87. On or about October 14, 2003, Mr. Fote advised Plaintiff-Relator to start billing from the first day Dr. Vlachos started, which he believed to be May 1, 2003.

11

88.    On October 15, 2003, Plaintiff-Relator became aware of a physician, Wassem Alam, M.D., was working at the Medicine Center without a contract.

89.    On or about October 17, 2003, Plaintiff-Relator provided to Defendant St. Joseph's employee, Ms. Brooks-Williams, details of the Women's Center charge reversal to wit:

The write-offs for the Women's Center will be reversed by one of the Physician Account Specialists (PAS) who will:

    i.      Reverse all services for Defendant Abdelrahman;

    ii.     Reverse all Blue Cross, Medicare and Medicaid, beginning August 1, 2003 for Dr. Vlachos; and

    iii.    Reverse all outpatient procedures for any of the moonlighters.

90.    On or about October 17, 2003, Plaintiff-Relator advised Ms. Brooks-Williams that once these reversals were accomplished, she would calculate the total dollar value of the reversals.

91.    On or about October 15, 2003, Plaintiff-Relator sought clarification from Ms. Brooks-Williams regarding the process for claims submissions related to the Women's Center and sought information as to whether her understanding of the process was correct, specifically:  In the outpatient office setting as of October 1, 2003: (1) all services overseen by Defendant Abdelrahman will be submitted to all insurance plans; (2) services overseen by Dr. Vlachos under Blue Cross, Medicare and Medicaid insurance will be submitted.  Claims will be submitted to other insurance plans once he is participating in them; (3) Services overseen by Defendant Kazzi will be submitted to all insurance plans, noting that he does not participate in a number of plans and to the extent services are rejected due to non-par, a system write-off will take place; and (4) Services overseen by any member of the "moonlighting pool" will not be submitted with the understanding that the "teaching physician" is

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

present in the office while the resident is rendering care. If at any time the teaching physician is not present, the expectation is no patient care is being rendered.

92.   On or about October 17, 2003, Ms. Brooks-Williams advised Plaintiff-Relator that her understanding regarding the claims submission is "correct."

93.   On or about October 17, 2003, Plaintiff-Relator learned of a staff request made to Mr. Fote as to how the billing department is to go forward with billing for the Women's Center when moonlighters are seeing patients.

94.   Upon information and belief, moonlighters were not credentialed with Oakland Physician Network Services (OPNS).

95.   Ms. Davio, Director of the Women's Center and Medicine Center sought direction from Mr. Fote regarding the moonlighting including concern regarding some days that are billable and some that are not.

96.   From on or about October 17, 2003 to October 25, 2003, Plaintiff-Relator took a vacation.

97.   On or about October 28, 2003, Plaintiff-Relator returned to work and reviewed certain internal correspondence regarding the payment of claims for the Women's Center.

98.   Upon information and belief, on or about October 24, 2003, Mr. Fote gave a directive to release the Women's Center claims for payment.

99.   On or about October 28, 2003, Plaintiff-Relator noted to staff that there was a problem with the claims that were submitted and with charges currently being entered for moonlighters, she specifically noted that upon receipt of payment, the billing department must refund payments for any of the moonlighters.

13

100.   During Plaintiff-Relator's vacation, the editing process for the moonlighters had been removed, and the claims were being submitted regardless of who rendered the service.

101.   Plaintiff-Relator advised her supervisors that this was a "billing nightmare" and advised that on October 29, 2003, there would be a discussion on how to handle the charges going forward.

102.   In response to her written statements regarding this, Ms. Roush sought to learn whom Plaintiff-Relator would be meeting with and to specify where the problems are coming from, and why she and Ms. Brooks-Williams were allegedly not hearing about the problems.

103.   On or about October 28, 2003, Plaintiff-Relator responded to Ms. Roush by stating that claims from May 1, 2003 to October 1, 2003 were stopped by an edit within the system and then written off as unbillable.  The allowable claims (i.e. Drs. Vlachos, Defendants Abdelrahman and Kazzi) from that time frame were put back on the system.  The edit remained in order to stop the moonlighter claims for an additional last week to verify that the fix to the edit would work.  Plaintiff-Relator then noted that unfortunately, while she was on vacation the previous week, someone removed the edit from the system and claims went out for all providers and that the more recent charges were due to be sent out without edits in place as well.  In order to prevent that from occurring, Plaintiff-Relator placed the edit back on the system for two days in order to run reports to capture the moonlighter charges during the preceding two weeks.  On the back end, she indicated that the billing department could generate a report and refund any payments to the plan.  She further noted that she would be meeting with Karen Davio, Toni Kufamn and Ivette (IDX System Coordinator) in order to address the moonlighter coverage problem.

104.   On or about October 28, 2003, Ms. Roush responded to Plaintiff-Relator sought clarification on the "moonlighters" issue and stated that the decision to bill or not to bill was within the domain of the Senior Leadership Committee (a committee that is made up of all vice presidents) with input from compliance.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

14

105.    On or about October 28, 2003, Plaintiff-Relator followed up with Ms. Roush and advised that she based her claims submission on the summary she previously provided to Ms. Brooks-Williams on October 15, 2003. She further stated that moonlighters are currently scheduled to cover the office and sometimes their coverage overlaps their inpatient coverage. Also, she reported that moonlighters routinely leave, do not show or show up late, and reminded Ms. Roush that these problems prompted the moonlighter claims to be held after the audit. She further reported that they also do not par with any of the HMO plans.

106.    On or about October 28, 2003, Ms. Roush responded to Plaintiff-Relator that this billing decision was not Plaintiff-Relator's decision, and that if she had information on ongoing issues that she needed to get them to Ms. Brooks-Williams, Ms. Roush or one of the attorneys.

107.    On or about October 28, 2003, Plaintiff-Relator advised Ms. Roush that Ms. Brooks-Williams had confirmed that Plaintiff-Relator's understanding of the claims submission was correct and that this information had been previously forwarded to Ms. Roush.

108.    On or about October 28, 2003, Plaintiff-Relator asked if she should hold the claims for the moonlighters based on the directive from Ms. Brooks-Williams.

109.    On or about October 28, 2003, Ms. Roush asked Ms. Brooks-Williams to determine if there was some reason to continue holding the moonlighter billing and noted that Steve Bender had advised her some time ago to resume billing.

110.    On or about October 28, 2003, Ms. Brooks-Williams advised Ms. Roush that they had a setback during Defendant Abdelrahman's vacation and noted that the concern was not compliance with PATH but that they were not credentialed through OPNS.

111.    On or about October 28, 2003, Ms. Roush indicated that billing needed to wait for credentialing but not for the other issues that Plaintiff-Relator raised.

LAW OFFICES
SOMMERS, SCHWARTZ & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

15

112. On or about October 28, 2003, Plaintiff-Relator sought further clarification regarding whether she should be billing for plans that the moonlighters are par with and write the others off to non-par.

113. On or about October 29, 2003, Ms. Brooks-Williams indicated that Plaintiff-Relator was correct regarding the billing process for the moonlighting physicians.

114. On or about October 30, 2003, Plaintiff-Relator sought clarification from Steven Bender, Assistant General Counsel, Trinity Health Chief Compliance Officer, regarding compliance concerns.

115. On or about October 30, 2003, Mr. Bender responded to Plaintiff-Relator that her concerns could be a compliance matter. He advised Plaintiff-Relator to work with Ms. Solomon to provide her with all of the pertinent details.

116. On or about October 30, 2003, Plaintiff-Relator was scheduled to meet with Ms. Brooks-Williams for her performance evaluation.

117. On or about October 30, 2003, when Plaintiff's arrived for her scheduled appointment, she was advised that Ms. Brooks-Williams would not be meeting with her.

118. On or about October 30, 2003, Plaintiff-Relator apprised Ms. Brooks-Williams of the outcome of her meeting with Karen Davio, Toni, and Ivette regarding their plan on how to enter charges for the Women's Center for the "in-house coverage staff".

119. In addition, they sought guidance from Ms. Brooks-Williams regarding the in-house coverage staff are non-par with the OPNS plans whereby the plan may reject for the physician non-par and it could be placed in self-pay. Plaintiff-Relator sought to learn whether the patient would be responsible for the bill and whether they should hold all self-pay (no insurance) customers responsible.

120. On or about October 30, 2003, Ms. Brooks-Williams responded that the patient should not be responsible if the entity was willing to schedule non-par providers.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

16

121.    On or about October 30, 2003, Ms. Kaufman noted that once in awhile, these billings would slip through and they are written off.

122.    On or about October 30, 2003, Plaintiff-Relator contacted with Ms. Davio regarding the Women's Center and discussed concerns about Ms. Davio's statement that she was not certain that the in-house coverage physicians were present at the time service was rendered when they are scheduled in the clinic as teaching physicians.

123.    Plaintiff-Relator requested her to report her concerns to Ms. Brooks-Williams, Ms. Solomon or Mr. Bender as soon as possible to allow for an investigation.

124.    On or about October 30, 2003, Ms. Davio denied indicating that physicians were not present at the Women's Center and that the Women's Center is compliant and there is no reason to report anything at this time.

125.    On or about October 31, 2003, Ms. Christiana Solberg stated that she did not believe the Women's Center was out of compliance.  She requested Plaintiff-Relator to trust her team and stated that they would not place the hospital, the network or Plaintiff-Relator at risk.

126.    On or about November 4, 2003, Lillian Padilla advised Plaintiff-Relator that Gina, an employee at the Medicine Center stated Dr. Bercu is covering every Tuesday for the month of November and that Dr. Bustamante instructed her to enter charges under him as the provider.  Plaintiff-Relator advised Gina to hold off charges until she advised her what to do.

127.    On or about November 5, 2003, Plaintiff-Relator documented concerns over a questionable billing practice involving Dr. Bradley billing as the teaching physician in the Women's Center even though he is a private physician.

128.    On or about November 5, 2003, Plaintiff-Relator called Ms. Paige Underwood to determine if Defendant Bradley's provision of this type service seemed unusual due to a pending lawsuit

17

and Plaintiff-Relator learned that Defendant Bradley did not have a contract to provide teaching physician services.

129.    On or about November 5, 2003, Plaintiff-Relator informed Mr. Bender of her belief that Dr. Bustamant's billing practices were not appropriate.

130.    On or about November 5, 2003, Plaintiff-Relator received a copy of the report from the Compliance Department regarding Defendant Kazzi and, it confirmed improper conduct on his part.

### E. DR. DANIEL SAK & THE SLEEP CENTER

131.    On or about October or November 2003, compliance issues surfaced regarding the Sleep Center.

132.    Up to November 2003, Defendant Sak's sleep study reports were never dictated.

133.    Upon information and belief, there is a high Medicare patient base in the Sleep Center.

134.    Plaintiff-Relator, upon learning the information regarding Defendant Sak's failure to write reports and improper billing for non-existent reports, directed one of her staff to investigate the matter. Plaintiff-Relator learned that zero reports had been completed and that Defendant Sak had charged for non-existent reports.

135.    Upon verifying this information, Defendant Sak's claims submissions were shut down, and an audit of Defendant Sak ensued.

136.    Following the audit, Defendant Sak was placed on a 100% review status, and he was placed on a performance plan in order to get his backlog caught up.

137.    In addition, after Defendant Sak's claims were put on hold, claims payments resumed for a period of time and then stopped again. In addition, Defendant Sak engaged in improper coding of his patient care because he was utilizing the same diagnostic code for every patient regardless of the study findings, calling into question whether the sleep studies were actually necessary.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

18

138.   Subsequent to the discovery of Dr. Sak's misconduct, the Compliance department began working on a project to verify that Medicare patient's were properly informed that they have the potential to receive two bills due to services being rendered at a Provider Based location.  During this review, it was discovered that claims coming from the same were/are being submitted with two different location addresses, which upon information and belief is improper.

## F. DR. LEONARD ROSENTHAL

139.   Defendant Rosenthal, M.D. is a pulmonologist located in a separate office in Pontiac, Michigan.

140.   Defendant Sak went to Defendant Rosenthal's office and saw patients there.

141.   On or about December 2003, audit information revealed that Defendant Rosenthal's documentation did not match the coding used for billing.

142.   Defendant St. Joseph's became concerned as to what Defendant Rosenthal was actually providing given the inaccurate coding.

143.   Defendant Rosenthal was placed on 100% review until the end of January 2004.

144.   Upon information and belief, Defendant Rosenthal's coding for years 2002 and 2003 were also not accurate.

## G.  DR. ALBERT BRADY

145.   Dr. Albert Brady, M.D. is an oncology physician located at Defendant St. Joseph.

146.   Defendant Brady provided in-patient services at Defendant St. Joseph.

147.   Defendant Bradley used a nurse to see in-patient patients, and billed his patients' as if the nurse's services were performed by him, charging as a physician rather than for nursing services.

148.   Plaintiff-Relator believes that Defendant Brady engaged in this practice from at least 2001 to 2004.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

149.    Upon information and belief, the patient mix is primarily Medicare.

150.    Upon information and belief, Ms. Solomon performed a <u>limited</u> audit for a period covering three months.

151.    Plaintiff-Relator received a patient list to complete refunds to patients for the improper charges that had been wrongly levied against them.

152.    Upon information and belief, the government may have been repaid for this approximate three-month period of time only.

153.    However, upon information and belief, this problem went well beyond three months.

## G. DR. JANE JOHNSON, M.D. MERCY MEDICAL GROUP – WATERFORD, MICHIGAN

154.    From on or about 2002, through at least 2004, Defendant Johnson utilized medical students to work as doctors located there.

155.    Medical student documentation was utilized by Defendant Johnson at Mercy Medical to illegally bill for these services as physicians' services.

156.    Upon information and belief, Defendant Mercy Medical Group has a high Medicaid patient mix.

157.    Defendant Johnson did not properly document her charts, and her billing was done without documentation, all in violation of federal law.

## H. LAKE ORION – DR. TIMOTHY DICKSON, M.D.

158.    Defendant Dickson utilized medical students to work in his office.

159.    Defendant Dickson used the students' documentation to charge as his own work for physician services.

160.    Upon information and belief, the payor mix has a high Medicare patient load.

20

## I. DR. VIOLETA GRIVEJ, M.D. NURSING HOME – BELLBROOK, ROCHESTER, MICHIGAN

161.    During Plaintiff-Relator's employment with St. Joseph, there were charge entry problems pertaining to the nursing home charges in that upcoding to patients' bills was occurring.

162.    At the time that Plaintiff-Relator had some responsibility over the nursing homes, Defendant Grivej was working at Bellbrook.

## J. RETALIATION

163.    On November 7, 2003, Mr. Fote notified Plaintiff-Relator that Ms. Brooks-Williams instructed him to place Plaintiff-Relator on a performance improvement plan.

164.    Prior to November 7, 2003, Plaintiff-Relator had not been reprimanded for any work performance nor had there been any verbal feedback from her superiors that she was in any way failing to fulfill her job duties.

165.    On or about November 7, 2003, Mr. Fote instructed Plaintiff-Relator to cease addressing the compliance issues, because it was "irritating" Ms. Brooks-Williams.  He then asked Plaintiff-Relator "what did you do to tick her off?"

166.    On or about January 13, 2004, Mr. Fote took Plaintiff-Relator off the bogus performance improvement plan.

167.    On or about February 5, 2004, Plaintiff-Relator informed several staff regarding her concerns over the problem with a non-par provider in the Women's Center.  Her complaints led to the Compliance Department investigating this issue.

168.    The results of the investigation led to the uncovering of the information that a physician was working in the clinic without a proper contract.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

169.    On or about February 10, 2004, Mr. Fote informed Plaintiff-Relator and Toni Kaufman that they would be submitting claims for the CRNAs as soon as March 1, 2004.

170.    In response to this information, Plaintiff-Relator, aware of a problem regarding the manner of reporting salaries and whether it would be proper to submit claims, went to Christiana Solberg, Director of Practice Operations, to seek information.

171.    In response to her inquiries, Ms. Solberg advised Plaintiff-Relator that she was still waiting for Ms. Roush to respond to her inquiry regarding whether the Billing Department should pursue billing for non-physician providers.

172.    On or about February 18, 2004, Plaintiff-Relator was informed that her position was "eliminated" and advised that she would have 45 days of work prior to her cessation of employment.

173.    On or about February 22, 2004, Plaintiff-Relator sent an e-mail to Ms. Brooks-Williams regarding her lack of communication on job-related matters.

174.    On or about February 23, 2004, Plaintiff-Relator was told to immediately pack her belongings and leave the premises.

175.    On or about March 1, 2004, Ms. Stacy Weinstein, Director of Practice Operations, disclosed details to Plaintiff-Relator of a meeting that she had attended with Ms. Roush, Mr. Bender, Ms. Solomon and Deb Baker.

176.    During the meeting, Mr. Bender expressed his concern regarding the way claims, including claims involving the Sleep Center, were being submitted and advised staff that it needed to stop.

177.    Plaintiff-Relator's unwarranted performance improvement plan and the so-called elimination of her job were in direct retaliation for her voicing concerns regarding the fraudulent billing practices extant with individuals and entities described above in this Complaint.

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## COUNT I - CONSPIRACY

178.    Plaintiff-Relator realleges and incorporates by reference paragraphs 1 through 177 of this Complaint, inclusive.

179.    Defendants herein conspired to defraud the United States government by causing false or fraudulent claims to be presented and/or paid for the purpose of obtaining, or aiding to obtain the payment or approval by the United States government of false or fraudulent claims.

180.    The United States government, unaware of the foregoing circumstances and conduct of Defendants herein, made full payment on said claims, all of which resulted in its being damaged in an amount to be determined.

## COUNT II

## PRESENTATION OF FALSE CLAIMS

181.    Plaintiff-Relator realleges and incorporates by reference paragraphs 1 through 180 of this Complaint, inclusive.

182.    Defendants knowingly presented or caused to be presented an agency, officer, or employee of the United States false or fraudulent claims for payment which were misallocations or misappropriations of federal funds with the federal law governing Medicare and Medicaid.

183.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments of said claims which resulted in its being damaged in an amount to be determined.

## COUNT III

## FALSE RECORDS

LAW OFFICES
BOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

184.    Plaintiff-Relator realleges and incorporates by reference paragraphs 1 through 183 of this Complaint, inclusive.

185.    Defendants knowingly made, used or caused to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the United States government.

## COUNT IV

## RETALIATION

186.    Plaintiff-Relator realleges and incorporates by reference paragraphs 1 through 185 of this Complaint, inclusive.

187.    Defendants harassed, retaliated, and discriminated against Plaintiff-Relator resulting in her baseless discipline and termination from her job in retaliation for her efforts to investigate and report the false claims described hereinabove.

188.    Defendants' actions against Plaintiff-Relator has sustained and will continue to sustain in the future wage loss, loss of benefits, permanent, disabling and serious personal injuries including but not limited to mental distress and anguish.

189.    Additionally, Defendants' actions were carried out in a deliberate manner and conscious disregard of Plaintiff-Relator's rights and were malicious, despicable and were intended to harm Plaintiff-Relator.  Plaintiff-Relator is thereby entitled to punitive damages against Defendants in an amount sufficient to punish Defendants and to deter future similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator on behalf of the United States demands judgment as follows:

A.    The United States is entitled to reimbursement of the federal funds obtained by Defendants as a result of fraudulent claims submitted to the United States.

LAW OFFICES
BOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

B.      The United States is further entitled to treble damages based upon the amount of damages sustained by the United States as a result of the Defendants' violations of 31 U.S.C. Section 3729(a)(2).

C.      The United States is entitled to civil penalties as required by 31 U.S.C. Section 3729(a) for each of the Defendants' fraudulent claims.

D.      Plaintiff-Relator is entitled to reasonable attorney fees and costs pursuant to 31 U.S.C. Section 3730(d).

E.      Judgment against Defendants for Relator two times the amount of any loss of back pay, future wage loss, past and future loss of benefits, compensatory damages, including mental damages and punitive damages, litigation costs and reasonable attorneys' fees.

F.      Reinstatement with the same seniority status Plaintiff-Relator would have had but for the wrongful suspension and discrimination she experienced; and

G.      An order of partial distribution pursuant to 31 U.S.C. Section 3730(d), to the Qui Tam Plaintiff-Relator, Sandra Fillion, equivalent to a percentage of the judgments recovered against Defendants, plus their costs and attorneys' fees.

Respectfully submitted,

SOMMERS, SCHWARTZ, SILVER &
SCHWARTZ, P.C.

By:      _____
PATRICIA A. STAMLER (P35905)
DANIEL D. SWANSON (P29288)
Attorney for Plaintiff
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

Dated: July 16, 2004

LAW OFFICES
SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C.
2000 TOWN CENTER • SUITE 900 • SOUTHFIELD, MICHIGAN 48075 • (248) 355-0300

## JURY DEMAND

Plaintiff-Relator Sandra Fillion on behalf of the United States of America, by and through her

attorneys, SOMMERS, SCHWARTZ, SILVER & SCHWARTZ, P.C., hereby demands a trial by jury.

Respectfully submitted,

SOMMERS, SCHWARTZ, SILVER &
SCHWARTZ, P.C.

By: _____
PATRICIA A. STAMLER (P35905)
DANIEL D. SWANSON (P29288)
Attorney for Plaintiff
2000 Town Center, Suite 900
Southfield, MI   48075
(248) 355-0300

Dated:   July 16, 2004

JS 44C
(Rev. 12/84)

Feikens 72635 MKM **CIVIL COVER SHEET** **ORIGINAL**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

United States of America, ex rel,
Sandra Fillion,

## DEFENDANTS

**04 - 72635**

Trinity Health - Michigan, et al

Oakland

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF **Wayne**
(EXCEPT IN U.S. PLAINTIFF CASES) 261163

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(C)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Patricia A. Stamler (P35905)
2000 Town Center, Suite 900
Southfield, MI 48075
(248) 355-0300

ATTORNEYS (IF KNOWN)

**JOHN FEIKENS**

MAGISTRATE JUDGE MONA K. MAJZOUB

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☑ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This action is brought pursuant to 31 U.S.C. Sec. 3730 for
damages and other relief under the False Claims Act.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury- Med Malpractice | ☐ 620 Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R R & Truck | | ☐ 450 Commerce/ICC Rates/ etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 650 Airline Regs | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 660 Occupational Safety/Health | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | ☐ 690 Other | ☐ 830 Patent | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 625 Drug Related Seizure/Prop | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC (405(g)) ☐ 863 DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 Habeas Corpus | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Accommodations | ☐ 535 Death Penalty | ☐ 791 Empl Ret Inc Security Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | ☐ 870 Taxes | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | ☐ 871 IRS Third Party 26 USC 7609 | ☑ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ( ) 535 Habeas/Death | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $

Check YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY

JUDGE _____ DOCKET NUMBER _____

DATE
7-16-04

SIGNATURE OF ATTORNEY OF RECORD
Patricia A. Stamler

UNITED STATES DISTRICT COURT